UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DALE BETLEM #424518,

                 Petitioner,                         Hon. Gordon J. Quist

v.                                            Case No. 1:17-CV-542

SHIRLEE HARRY,

                 Respondent.

_____/


## REPORT AND RECOMMENDATION

       This matter is before the Court on Betlem's petition for writ of habeas corpus.   In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Betlem's petition be **denied**.

## BACKGROUND

       Petitioner was charged in this matter with four counts of first degree criminal sexual conduct, two counts of second degree criminal sexual conduct, and one count of distributing obscene material to a minor.  (Trial Transcript, January 17, 2014, at PageID.1002).  Petitioner was also charged with being an habitual offender.  (Trial Transcript, January 16, 2014, at PageID.540-41).  Several individuals testified at Petitioner's bench trial.  The relevant portions of their testimony are summarized below.

**J.B.**

J.B. is Petitioner's daughter.  (Trial Transcript, January 14, 2014, at PageID.547). As of Petitioner's trial, J.B. was ten (10) years of age.  (Trial Transcript, January 14, 2014, at PageID.544).   Petitioner "made" J.B. watch a video depicting "little girls" having sex with their fathers.  (Trial Transcript, January 14, 2014, at PageID.551).   Petitioner also showed J.B. a video of Petitioner having sex with J.B.'s step-mother, Trisha.  (Trial Transcript, January 14, 2014, at PageID.552, 557-58).   On multiple occasions, Petitioner penetrated J.B. vaginally with his penis.  (Trial Transcript, January 14, 2014, at PageID.552-67).   Petitioner told J.B. that "this was the only way for you to get off being grounded."  (Trial Transcript, January 14, 2014, at PageID.567).   When J.B. asked Petitioner "to stop," Petitioner responded, "shut up."  (Trial Transcript, January 14, 2014, at PageID.556).   Petitioner also told J.B. that if she told anybody what he was doing, he would "seriously hurt" her.  (Trial Transcript, January 14, 2014, at PageID.564).

**Trisha Betlem**

Betlem began having sex with Petitioner "almost every day" when she was thirteen (13) years old and Petitioner was twenty-nine (29) years old.  (Trial Transcript, January 14, 2014, at PageID.605-06).   Betlem and Petitioner have five children together, all boys.  (Trial Transcript, January 14, 2014, at PageID.589).   Betlem married Petitioner in 2007.  (Trial Transcript, January 14, 2014, at PageID.589).   J.B. began living with Petitioner and Betlem "from day one."  (Trial Transcript, January 14, 2014, at PageID.592).   Betlem was not happy living with Petitioner, however, and would spend a great deal of time at her mother's residence leaving J.B. alone with Petitioner.  (Trial Transcript, January 14, 2014, at PageID.601-02).

Petitioner "grounded" J.B. "almost every day," forcing J.B. to stay in her bedroom. (Trial Transcript, January 14, 2014, at PageID.602).   On one occasion in 2010, Betlam caught Petitioner in J.B.'s bedroom at approximately 2:00 a.m.   (Trial Transcript, January 14, 2014, at PageID.603).   Petitioner claimed that he was giving J.B. a bottle, but Betlam was "suspicious." (Trial Transcript, January 14, 2014, at PageID.603).[1]

**Nancy Bartley**

Bartley is Trisha Betlem's mother.   (Trial Transcript, January 15, 2014, at PageID.631).   Bartley and J.B. were "very close."   (Trial Transcript, January 15, 2014, at PageID.631-32).   Petitioner would often "ground" J.B. and "send her to her room."   (Trial Transcript, January 15, 2014, at PageID.637).   Petitioner and Trisha Betlem's children would often visit Bartley, but J.B. would often not attend because she was "grounded."   (Trial Transcript, January 15, 2014, at PageID.639-40).

When J.B. was six or seven years old, she told Bartley that Petitioner "had touched her in her no no spots."   (Trial Transcript, January 15, 2014, at PageID.641-42).   Bartley informed Petitioner of J.B.'s allegations.   (Trial Transcript, January 15, 2014, at PageID.642). The next day, Petitioner and J.B. visited Bartley.   (Trial Transcript, January 15, 2014, at PageID.642).   Petitioner told J.B. "tell Grandma the truth," at which point J.B. "hung her head and [stated] it wasn't [Petitioner] it was papa Frank," J.B.'s maternal grandfather.   (Trial Transcript, January 15, 2014, at PageID.642).   On an occasion in June 2013, J.B. appeared "scared" and began "to cry," telling Bartley that she needed to talk to her.   (Trial Transcript, January 15, 2014, at PageID.635).   After Bartley spoke with J.B., Bartley spoke with the police. (Trial Transcript, January 15, 2014, at PageID.636-37).

---

[1] Given that J.B. was ten years old in January 2014, she would have been no younger than five years old when this alleged incident occurred.

**Wesley Jourden**

As of June 24, 2013, Jourden and Petitioner had been friends for approximately fifteen (15) years. (Trial Transcript, January 15, 2014, at PageID.655). On this date, Jourden learned that Petitioner had "left the county with his children." (Trial Transcript, January 15, 2014, at PageID.655-56). Jourden spoke with Petitioner who stated that "he was traveling to his father's residence in Colorado." (Trial Transcript, January 15, 2014, at PageID.656-57).

**April Noha**

Noha is J.B.'s mother. (Trial Transcript, January 15, 2014, at PageID.665). Noha and Petitioner have two other children together. (Trial Transcript, January 15, 2014, at PageID.665-66). Noha and Petitioner began having sex when Noha was twelve (12) years old and Petitioner was twenty-four (24) or twenty-five (25) years old. (Trial Transcript, January 15, 2014, at PageID.666-67). In June 2013, Noha learned that Petitioner had taken their children and was planning on going to Colorado. (Trial Transcript, January 15, 2014, at PageID.668-69).

**Jennifer Guyette**

Guyette and Petitioner have a son together. (Trial Transcript, January 15, 2014, at PageID.678). On the afternoon of June 19, 2013, Petitioner contacted Guyette requesting that the two meet at a nearby gas station. (Trial Transcript, January 15, 2014, at PageID.678-79). Guyette agreed to Petitioner's request. (Trial Transcript, January 15, 2014, at PageID.679-80). When Guyette arrived at the location in question, she observed that J.B. and at least one other child were in Petitioner's custody. (Trial Transcript, January 15, 2014, at PageID.679-80). Petitioner was crying and appeared to be experiencing "panic and upset." (Trial Transcript, January 15, 2014, at PageID.680).

Petitioner indicated that the children in his custody needed to be returned to their mother, but he could not return home because "he had to get out of town."  (Trial Transcript, January 15, 2014, at PageID.680-85).   Petitioner asked Guyette to return the children to their mother and provide him with a location to park his truck and camper.  (Trial Transcript, January 15, 2014, at PageID.680-85).   Guyette agreed to return the children to their mother, but when she hesitated at Petitioner's other request, Petitioner told her that if she did not help him find a location to park his truck and camper, Guyette "wouldn't be able to talk to" their son.  (Trial Transcript, January 15, 2014, at PageID.680-85).

**Jeffrey Erickson**

As of June 22, 2013, Erickson was employed as a Chippewa County Deputy Sheriff.  (Trial Transcript, January 15, 2014, at PageID.690-91).   On this date, Erickson was dispatched to investigate a reported sexual assault.  (Trial Transcript, January 15, 2014, at PageID.691-92).   Upon arriving at the location, Erickson realized that the alleged victim was a minor at which point he contacted Detective Sergeant Greg Postma.  (Trial Transcript, January 15, 2014, at PageID.692-93).   Detective Postma instructed Erickson to not speak with the alleged minor victim and to instead allow Postma to conduct a forensic interview with the child.  (Trial Transcript, January 15, 2014, at PageID.692-94).   Erickson complied with this instruction. (Trial Transcript, January 15, 2014, at PageID.694).

Erickson later participated in a search of Petitioner's residence.  (Trial Transcript, January 15, 2014, at PageID.695).   When conducting the search, Erickson observed a computer desk and could discern from the dust pattern on the desk that certain items had been recently removed.  (Trial Transcript, January 15, 2014, at PageID.694-95).   Law enforcement officials recovered various items of evidence including several pairs of "young girl's underwear."  (Trial

Transcript, January 15, 2014, at PageID.695-97).   Erickson also received from April Noha certain items of clothing.   (Trial Transcript, January 15, 2014, at PageID.699).

**Walter Wiater**

As of June 2013, Wiater was employed as a Chippewa County Deputy Sheriff. (Trial Transcript, January 15, 2014, at PageID.708-09).   As part of the investigation into this matter, Wiater obtained DNA samples from Petitioner, Trisha Betlem, and J.B.   (Trial Transcript, January 15, 2014, at PageID.710-20).

**Wendy Jamros**

In June 2013, Jamros, an advanced practice nurse, performed a sexual assault forensic examination of J.B.   (Trial Transcript, January 15, 2014, at PageID.727-32).   This examination revealed that J.B. was suffering from a vaginal infection and irritation consistent with having engaged in sexual intercourse.   (Trial Transcript, January 15, 2014, at PageID.732-38).

**Kathryn Mitchell**

Mitchell, a registered nurse, assisted Wendy Jamros when she examined J.B. (Trial Transcript, January 15, 2014, at PageID.747-53).

**Michael Bitnar**

As of June 2013, Bitnar was employed as a Chippewa County Undersheriff.   (Trial Transcript, January 15, 2014, at PageID.756-57).   As part of the investigation into this matter, Bitnar transported certain physical evidence to the Michigan State Police laboratory in Grayling, Michigan.   (Trial Transcript, January 15, 2014, at PageID.756-60).

**Jennifer Patchin**

As of June 2013, Patchin was employed as a forensic scientist for the Michigan State Police.   (Trial Transcript, January 15, 2014, at PageID.767-68).   Patchin performed

forensic testing on a pair of J.B.'s underwear.   (Trial Transcript, January 15, 2014, at PageID.770-71).  Upon examining this underwear, Patchin immediately discerned a "very offensive" odor consistent with a sexually transmitted disease.   (Trial Transcript, January 15, 2014, at PageID.772).   Chemical testing of J.B.'s underwear revealed a "high concentration [of] seminal fluid."  (Trial Transcript, January 15, 2014, at PageID.772-73).   In light of this finding, Patchin removed material from J.B.'s underwear so that a different laboratory could perform DNA testing. (Trial Transcript, January 15, 2014, at PageID.773-90).

**Ann Hunt**

As of June 2013, Hunt was employed by the Michigan State Police as a forensic scientist.  (Trial Transcript, January 15, 2014, at PageID.792-93).   Hunt performed DNA testing on material provided to her by Jennifer Patchin.   (Trial Transcript, January 15, 2014, at PageID.793-800).   The results of Hunt's DNA testing revealed that biological material recovered from J.B.'s underwear "matched the known [DNA] sample of [Petitioner]."  (Trial Transcript, January 15, 2014, at PageID.800-09).

**Greg Postma**

As of June 20, 2013, Postma was employed as a Detective Sergeant with the Chippewa County Sheriff's Department.   (Trial Transcript, January 15, 2014, at PageID.820-21). On this date, Postma spoke with Petitioner regarding reports that Petitioner was "leaving the area" with his children.   (Trial Transcript, January 15, 2014, at PageID.821-22).   Petitioner told Postma that he "didn't want to come back [home] right away" because he feared allegations that he had abused his children.   (Trial Transcript, January 15, 2014, at PageID.822-23).

On June 22, 2013, Deputy Erickson contacted Postma to report that he had been dispatched to investigate an allegation that Petitioner had sexually assaulted J.B.   (Trial

Transcript, January 15, 2014, at PageID.823-24).   Postma told Erickson that he would "like to have an opportunity to interview [J.B.] forensically at the office."   (Trial Transcript, January 15, 2014, at PageID.824).   Later than day, Postma spoke with J.B.   (Trial Transcript, January 15, 2014, at PageID.824-25).   When interviewing J.B., Postma followed the "child forensic interview protocol."   (Trial Transcript, January 15, 2014, at PageID.825).

Postma spoke with J.B. for approximately 45-60 minutes immediately after which he secured a search warrant to search Petitioner's residence.   (Trial Transcript, January 15, 2014, at PageID.826-28).   Postma participated in the subsequent search of Petitioner's residence. (Trial Transcript, January 15, 2014, at PageID.828-29).   During the search, Postma observed a computer desk from which he concluded, based upon the dust patterns, that computers had recently been removed.   (Trial Transcript, January 15, 2014, at PageID.829).   Postma subsequently participated in a search of Jennifer Guyette's residence.   (Trial Transcript, January 15, 2014, at PageID.831-32).   This search revealed numerous items, including computers and pornography which depicted young girls having sex with their fathers.   (Trial Transcript, January 15, 2014, at PageID.832-49).

On June 24, 2013, Postma contacted Petitioner by telephone.   (Trial Transcript, January 15, 2014, at PageID.850-51).   Petitioner sounded anxious and indicated that he had heard "rumors" that J.B. had accused him of sexual assault.   (Trial Transcript, January 15, 2014, at PageID.851-52).   Petitioner denied assaulting J.B., stating that he "had never been around her" and "had never been alone with her."   (Trial Transcript, January 15, 2014, at PageID.852). Petitioner was arrested later day in Sanilac County, Michigan, and transported back to Chippewa County, Michigan the following day.   (Trial Transcript, January 16, 2014, at PageID.895-96). Upon Petitioner's return to Chippewa County, he was interviewed by Detective Postma.   (Trial

Transcript, January 16, 2014, at PageID.896-98).   When Petitioner was arrested, he had in his possession a cell phone which contained a video of Petitioner and Trisha Betlem having sex. (Trial Transcript, January 16, 2014, at PageID.906-12).   Petitioner "denied touching" J.B. and stated that the authorities would not discover any evidence supporting J.B.'s allegations.   (Trial Transcript, January 16, 2014, at PageID.898).

**Amber Lahaie**

As of the date of Petitioner's trial, Lahaie was twenty-eight (28) years of age. (Trial Transcript, January 16, 2014, at PageID.933).   When Lahaie was fourteen (14) years old she began having a sexual relationship with Petitioner who was twenty-eight (28) years old at the time.   (Trial Transcript, January 16, 2014, at PageID.933-34).   When asked why she engaged in a sexual relationship with Petitioner, Lahaie stated, "I guess I was young and it probably felt good to have someone older interested in me and I think he played on that."   (Trial Transcript, January 16, 2014, at PageID.935-36).

**Jenny Tasker**

Tasker is Petitioner's younger sister.   (Trial Transcript, January 16, 2014, at PageID.940-41).   Petitioner repeatedly sexually assaulted Tasker when she was approximately nine (9) years of age.   (Trial Transcript, January 16, 2014, at PageID.941-45).   Petitioner told Tasker that if she told anybody he would "hurt" her.   (Trial Transcript, January 16, 2014, at PageID.945).

**Dale Betlem**

Petitioner acknowledged that he was previously convicted of fourth degree criminal sexual conduct.   (Trial Transcript, January 16, 2014, at PageID.953-54).   Petitioner and Trisha Betlem separated in 2013 after Petitioner learned that Trisha was having sex with one of

Petitioner's friends.  (Trial Transcript, January 16, 2014, at PageID.954-56).  Following their separation, Trisha told Petitioner that she "was going to take [their children] away from [Petitioner]" and "was gonna do whatever she wanted, or whatever she could to keep her kids." (Trial Transcript, January 16, 2014, at PageID.960).  When Petitioner asked Trisha to meet and talk about the matter, Trisha responded, "It's over with.  I'm taking the kids."  (Trial Transcript, January 16, 2014, at PageID.960-61).  Petitioner denied ever sexually assaulting J.B.  (Trial Transcript, January 16, 2014, at PageID.961-65).  Petitioner stated that Amber Lahaie was lying, but conceded that his relationship with her was the basis for his previous conviction for criminal sexual conduct.  (Trial Transcript, January 16, 2014, at PageID.979-80).  Petitioner stated that April Noha lied when she testified that she began having sex with Petitioner when she was twelve (12) years old.  (Trial Transcript, January 16, 2014, at PageID.981).  When asked if he "touched" his sister in a "sexual manner," Petitioner stated, "I don't recall to be honest."  (Trial Transcript, January 16, 2014, at PageID.980).

Following the presentation of evidence, the trial judge found Petitioner guilty of four counts of first degree criminal sexual conduct and one count of distributing obscene material to a minor.  (Trial Transcript, January 17, 2014, at PageID.1016-24).  Petitioner was sentenced as an habitual offender to serve consecutive sentences of 30-60 years in prison for each of the four first degree criminal sexual conduct convictions.  (Sentencing Transcript, February 19, 2014, at PageID.1055).  Petitioner subsequently appealed his conviction in the Michigan Court of Appeals.  The following claims were asserted by Petitioner's attorneys:

I.      Because none of the sentencing offenses arose from the same transaction, the sentences must be amended to run concurrently.

II.     Because the judge's mid-trial comments about Defendant-Appellant Dale Betlam's coming "appeal period" betrayed her prejudgment of the issues, she should have granted the defense motion to declare a mistrial and recused herself.

III.    The trial court reversibly erred when it allowed in MCL 768.27a evidence of allegations of prior commission of a listed offense where the prejudicial effect substantially outweighed the probative value and should have been excluded.

Petitioner also submitted a pro per supplement in which he asserted the following additional issues:

IV.    Bias and previous knowledge disqualifying a judge.

V.    Appellant's conviction must be reversed as the prosecution failed to present sufficient evidence to satisfy the due process standard of guilt beyond a reasonable doubt.

VI.    Right to due process.   The right to due process is a constitutional right and to have these rights taken from you is a serious matter.

VII.    Perjury and improper statement by prosecutor to police.

VIII.    Ineffective assistance of counsel.

The Michigan Court of Appeals affirmed Petitioner's conviction, but remanded the matter to the trial court "with instructions to prepare an amended judgment of sentencing calling for concurrent sentencing."  *People v. Betlem*, 2015 WL 4772172 (Mich. Ct. App., Aug. 13, 2015).  Raising the same issues, Petitioner moved in the Michigan Supreme Court for leave to appeal which was denied.  *People v. Betlem*, Case No. 152395, Order (Mich., Mar. 29, 2015). On June 15, 2017, Petitioner initiated the present action asserting the following claims:

I.    Because none of the sentencing offenses arose from the same transaction, the sentences must be amended to run concurrently.

II.    Because the judge's midtrial comments about Petitioner's coming "appeal period" betrayed her prejudgment of the issues, she should have granted the defense motion to declare a mistrial and recused herself.

III.    The trial court's bias and use of previous knowledge violated Petitioner's due process rights to a fair trial and sentencing.

IV.     Petitioner is entitled to a new trial where the verdict is against the great weight of the evidence, and it would be a denial of due process and a miscarriage of justice to allow Petitioner's conviction to stand.

V.      Petitioner's right to due process was violated in many ways, and the cumulative effect denied him a fair trial.

VI.     Petitioner was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments, where counsel (a) refused to investigate and call Jennifer Sheppard, subpoena exculpatory witness, and failure to ask for continuance to seek potential of discovery evidence; and (b) defense counsel's failure to object to the admission of MCL 768.27a evidence constituted ineffective assistance of counsel.

VII.    Petitioner was denied a fair trial through the prosecution's withholding of evidence.

VIII.   Petitioner was denied his constitutional right to due process of law and a speedy trial by unconscionable delays, by being illegally and unconstitutionally held without bail.

IX.     Petitioner was denied due process where there was no probable cause to [ar]rest without search warrant.

## STANDARD OF REVIEW

Betlem's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.   The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

   (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

   (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).  As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet."  *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (internal quotation omitted).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists."  *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also, Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams,* 529 U.S. at 411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court

unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.* For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the

requirements of either § 2254(d)(1) or § 2254(d)(2).   This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"   *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).   Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits."   *Id.* at 784-85.   Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely."   *Id.*   If this presumption is overcome, however, the Court reviews the matter de novo.   *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Consecutive Sentencing

As noted above, the trial judge initially sentenced Petitioner to serve four consecutive sentences of 30-60 years in prison for each of his four first degree criminal sexual conduct convictions.   Petitioner argues that he is entitled to relief from this Court because under Michigan law it was improper to require that these sentences be served consecutively.   First, Petitioner is not entitled to relief in this Court for alleged violations of state law.   *See* 28 U.S.C. § 2254.   More importantly, Petitioner already prevailed on this claim on his appeal as of right to

the Michigan Court of Appeals, as also noted above.    Accordingly, this claim raises no issue on which habeas relief may be granted.

## II.                Speedy Trial Act Claim

Petitioner asserts that his Sixth Amendment right to a speedy trial was violated in this matter.    The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial and public trial."    U.S. Const. amend. VI.    This right applies to the states through the Fourteenth Amendment.    *See Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).    When analyzing a claim that a criminal defendant was denied the right to a speedy trial, the court must consider the following factors: (1) length of the delay; (2) reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered prejudice.    *Ibid.* (quoting *Barker v. Wingo*, 407 U.S. 514, 533 (1972)).

If the defendant fails to demonstrate that the delay was "uncommonly long," his claim fails and the analysis need proceed no further.    *See Stegall*, 427 F.3d at 1025-26.    If, on the other hand, the defendant satisfies this initial threshold, the remaining factors are "considered together with such other circumstances as may be relevant."    *Stegall*, 427 F.3d at 1025.    The length of the delay is measured "from the date of the indictment or the date of arrest, whichever is earlier."    *Id.* at 1026.    A delay is presumptively prejudicial "when it approaches one year." *United States v. Gardner*, 488 F.3d 700, 719 (6th Cir. 2007).

Petitioner was arrested on June 24, 2013, and his criminal trial began on January 14, 2014.    Thus, Petitioner experienced a delay of 205 days between the date of his arrest and the commencement of his trial.    The delay experienced by Petitioner in this matter was not

16

"uncommonly long" and, therefore, the Court need not analyze the remaining factors as Petitioner did not suffer a violation of his right to a speedy trial. *See Gardner*, 488 F.3d at 719 (a 265 day delay was not "uncommonly long" and, therefore, the defendant's Sixth Amendment right to a speedy trial was not violated).

Petitioner asserted this claim in his appeal of right to the Michigan Court of Appeals. While that court did not expressly address this particular issue, the court obviously denied Petitioner's request for relief. This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## III.        Pretrial Bail

Petitioner argues that he is entitled to relief because he was "illegally and unconstitutionally held without bail" pending his criminal trial. Petitioner's conviction, however, renders moot any claim regarding his pretrial detention and alleged improper denial of bail. *See, e.g., Anger v. Klee*, 2015 WL 6437224 at *11 (E.D. Mich., Oct. 21, 2015) (citations omitted). Petitioner asserted this claim in his appeal of right to the Michigan Court of Appeals. While that court did not expressly address this particular issue, the court obviously denied Petitioner's request for relief. This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.**         **Judicial Bias**

Petitioner makes numerous claims of judicial bias which Petitioner alleges denied

him the right to a fair trial.   Each of Petitioner's allegations is explored below.

A.         Time for Appeal Comment

At the conclusion of Ann Hunt's testimony, the trial judge made the following

comments:

> Before you disconnect,[2] I'd like the record to reflect that I handed
> back to Detective Postma exhibits 25, 24, 30 and 31 for keeping in
> order for the chain of evidence to be preserved on[c]e we are out of
> court.  As with all evidence, just to be for the record, we cannot
> destroy, or give back any evidence that's been admitted in this file
> even though it's in your safekeeping for, I would ask for at least 45
> days after the ending to allow for an appeal period to run.
>
> That's a little longer than the appeal period you actually have Dale,
> but just to be safe nothing is lost in the mail I always give it a little
> extra time.   In case it becomes an issue for either side I just wanted
> to make sure nothing gets lost.

(Trial Transcript, January 15, 2014, at PageID.816).

The following day, Petitioner moved the trial judge to either declare a mistrial or

recuse herself from the matter.   (Trial Transcript, January 16, 2014, at PageID.864-65).   The

court denied Petitioner's motion, stating as follows:

> Okay, alright. So noted. Just to address that briefly, at the time that
> I stated it I think my history has shown that I've done it several times
> throughout jury trials, bench trials and any other types of hearings.
> I like to make sure that the defendants are well informed of what's
> going on, the timelines, and what's happening.
>
> When I said that I was going to preserve for 45 days, I knew that
> counsel was aware that an appellate period didn't last that long,
> because someone will win and someone will lose and someone will

---

2 Ms. Hunt testified remotely via an audio and video connection.

probably appeal. That's how I look at every case. So every case adhere to the facts that there may be an appellate issue and an appellate review of it. Then I try to keep everything on the record for that particular reason.

I wanted to make sure that he wasn't confused with the timelines. Because when I said the 45 days, it was to allow extra time but I didn't want to go out of here, defendants sometimes do, remembering only the word 45 days and nothing else that was said. So I did gear it towards him to understand that a 45 day wasn't a normal appellate period that it would be less than that if he filed an appeal following the end of this trial.

I don't believe that it showed bias one way or the other. It was merely being informative in nature. If you think that I should give an instruction to him that it was informative in nature and not an actual opinion that the court had I would be happy to do so. I wasn't sure if you had discussed this motion with him prior to him coming and I didn't want to upset unnecessarily if we could avoid. But I'd be happy to give him instruction that it was to be taken in an informative light and not as the opinion of the court.

Quite frankly, I've learned lots of new things yesterday. Something's I understand, something's I don't. I look forward to today's testimony to see what other new evidence we have because coming into this I had a rough idea what it was going to be about and merely based upon the charges and the complaint and information but not to the extent of the proofs that would be offered.

And I have yet to hear yours and to see whether or not Mr. Betlem himself is going to testify to try to explain that as well. So I look forward to that in seeing the conclusion of this trial and I inform you, and Ms. Chambers, that I do not believe that I'm bias or prejudice in any way .

And under the motion to recuse the court has to take deep soul searching to determine whether or not we feel that we're biased and unable to give a fair opinion after hearing all of the facts. And I would state that I have, having done a deep soul searching I believe I can continue this trial in a fair manner. But I thank you for your objection and it is duly noted.

(Trial Transcript, January 16, 2014, at PageID.866-68).

Petitioner argues that he is entitled to relief because the trial judge should have either granted his motion for mistrial or recused herself.   Petitioner argues that the trial judge's conduct violated his right to a fair trial.

The Fourteenth Amendment to the United States Constitution guarantees to every criminal defendant the right to a "fair trial in a fair tribunal before a judge with no actual bias against the defendant."   *Lyell v. Renico*, 470 F.3d 1177, 1186 (6th Cir. 2006) (quoting *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997)).   To prevail on his claim of judicial bias, Petitioner must demonstrate that the trial judge exhibited conduct "so extreme as to display clear inability to render fair judgment."   *Lyell*, 470 F.3d at 1186-87 (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)).

As the Supreme Court has observed, however, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion."   *Liteky*, 510 U.S. at 555.   Furthermore, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, *or of prior proceedings*, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."   *Ibid.* (emphasis added).

It is not reasonable to interpret the trial judge's comments at issue as reflecting an inability to render a fair judgment.   On their face, the challenged comments were nothing more than the judge "thinking out loud" and explaining to Petitioner her rationale for her actions.   This conclusion is underscored by the trial judge's comments the following day.   The Michigan Court of Appeals rejected this claim, stating as follows:

> We are satisfied that the judge well explained why her advice to
> defendant about an appeal period did not indicate that she had

already adjudged him guilty. She explained that she was ever mindful that her decisions were subject to appeal, and that it was because she knew that the attorneys knew about such things as timing deadlines that she addressed defendant in particular. Appellate counsel challenges that explanation for neutrality on the ground that prosecutors may not appeal verdicts of acquittal, but we remain mindful that prosecutor's appeals are nonetheless not uncommon.

Moreover, appellate counsel's position suggests that the trial judge, at worst, falsely offered benign explanations for her comments in order to disguise actual bias or, at best, was misled by a tragic lack of self-awareness in the matter. We decline to interpret the judge's remarks so cynically.

For these reasons, appellate counsel has failed to show that the judge below abused her discretion in denying defense counsel's motions for a mistrial and to recuse herself.

*Betlem*, 2015 WL 4772172 at *2-3.

This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.      Testimony that Petitioner Previously had Sex with Underage Girls

When rendering her verdict, the trial judge commented that Trisha Betlam and April Noha "conceived their first child [with Petitioner] while 15 years old."   (Trial Transcript, January 17, 2014, at PageID.1021-22).   At sentencing, Petitioner alleged that the trial judge exhibited improper bias by concluding that Petitioner was guilty of "getting [his] wife pregnant when that charge hasn't even come to light yet."   (Sentencing Transcript, February 19, 2014, at PageID.1047-48).   Petitioner alleges that the trial judge nevertheless "used evidence from that in this trial."   (Sentencing Transcript, February 19, 2014, at PageID.1047-48).   The trial judge

responded that "all these ladies testified as to when they got pregnant and when they started having sex with you." (Sentencing Transcript, February 19, 2014, at PageID.1048).

While Petitioner is correct that the trial judge misspoke when she stated that the women in question testified as to their age when Petitioner impregnated them, the Court fails to discern how this rendered Petitioner's trial unfair. Three women testified that Petitioner fathered children with them. Trisha Betlam and April Noha testified that they began having sex with Petitioner when they were thirteen (13) and twelve (12) years of age, respectively. The Court fails to discern how the mistaken statement by the trial judge that these women expressly indicated their age when they were impregnated by Petitioner deprived Petitioner of a fair trial. As the Michigan Court of Appeals noted in denying this claim, determining the age at which these women were impregnated was possible by performing simple mathematical calculations based upon the women's then present age and the age of their children with Petitioner. *Betlem*, 2015 WL 4772172 at *4. While it appears that Betlam and Noha were, in fact, sixteen (16) years of age when Petitioner impregnated them, as the Michigan Court of Appeals concluded:

> Defendant complains that his trial judge insisted over his objections that the evidence indicated that he had impregnated his wife, and also the mother of two other of his children, while they were 15 years old. In fact, the latter testified that she was 16 years old when her eldest child with defendant was born. Given that human gestation is commonly understood to be approximately nine months, that account could reasonably lead a fact-finder to suppose that this witness was in her fifteenth year at the beginning of that pregnancy. In any event, considering that this witness also testified that her sexual relationship with defendant was underway by the time she was 13 years old, even if closer attention to actual birthdates, and perhaps resort to medical records, would have suggested that that pregnancy actually began after that witness's sixteenth birthday, the trial court's statement that she was 15 was nonetheless close to the mark, with any error in fact being of no great significance.

> Similarly, defendant's wife dated her sexual relationship with defendant to her thirteenth year, and testified that she was 24 years old at the time of trial, and that her eldest child with defendant was seven. The difference in ages suggests that she was likely 17 years old when that child was born, which in turn suggests that she was likely 16 years old when she became pregnant. The trial court's statement that defendant impregnated her during their second, instead of third or fourth, year of sexual intimacy was at worst a minor mischaracterization of the facts. We do not consider any of the court's minor deviations from what more meticulous date calculations would have indicated to be evidence of judicial bias.

*Betlem*, 2015 WL 4772172 at *4.

As for Petitioner's suggestion that the trial judge found him guilty of sexually assaulting J.B. based upon a belief that Petitioner was guilty of other, uncharged crimes, Petitioner's argument relies entirely on speculation and conjecture.  Petitioner has failed to identify, and the Court does not discern, anything in the record which supports this argument.

The denial of this claim by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.      Trial Judge Prejudged Petitioner's Guilt

The judge who presided over Petitioner's trial also presided over his preliminary examination.  Petitioner argues that this circumstance denied him of the right to a fair trial because it indicates that the trial judge pre-judged his guilt before his trial even began.  The decision to bind Petitioner over for trial at the conclusion of his preliminary examination was based on a finding that there existed probable cause that Petitioner committed the crimes in question. This is a far different, and much lower, standard than the proof beyond a reasonable doubt standard

required to convict.    Simply put, the fact that the trial judge had previously found that there existed probable cause that Petitioner committed the crimes in question does not indicate or even suggest that the judge improperly pre-judged Petitioner's guilt.    Petitioner has failed to identify, and the Court does not discern, anything in the record supporting this claim.

The Michigan Court of Appeals denied this claim.        *Betlem*, 2015 WL 4772172 at *3.    This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.    Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.    Accordingly, this claim raises no issue upon which habeas relief may be granted.

D.    Plea Bargain Comment

Petitioner next argues that the trial judge "showed bias the day of the trial when [she] came to my cell with my attorney and stated if you don't feel you will get a fair trial[, t]hen take the plea bargain."    Petitioner has failed to identify anything in the record, or presented other evidence, indicating or suggesting that the trial judge spoke with him outside the courtroom.    The record does indicate, however, that at the outset of trial a brief discussion occurred in which Petitioner's counsel stated that Petitioner has been offered a plea bargain, but was rejecting such. (Trial Transcript, January 14, 2014, at PageID.539-41).    This brief discussion does not reveal any evidence of bias on the part of the trial judge.    Petitioner asserted this claim in his appeal of right to the Michigan Court of Appeals.    While that court did not expressly address this particular issue, the court obviously denied Petitioner's request for relief.    This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.    Furthermore, this

decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## V. Sufficiency of the Evidence

Petitioner next claims that he is entitled to relief because his convictions are not supported by constitutionally sufficient evidence. Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Pursuant to Michigan law, an individual is guilty of criminal sexual conduct in the first degree if he engages in sexual penetration with another person who is under thirteen (13) years of age. Mich. Comp. Laws § 750.520b(1)(a). Pursuant to Michigan law, an individual is guilty of providing obscene material to a minor if he knowingly disseminates to a minor sexually explicit material which is harmful to minors. Mich. Comp. Laws § 722.675. Knowingly showing

pornographic movies to a minor constitutes a violation of this provision.  *See People v. Chontos*, 2004 WL 1699070 at *1-2 (Mich. Ct. App., July 29, 2004).

The evidence presented at trial, interpreted pursuant to the aforementioned standard, amply supports Petitioner's convictions.   While Petitioner accurately notes that there existed evidence that arguably did not support his conviction, the Court must presume that the trial judge weighed this competing evidence and resolved any evidentiary conflicts against Petitioner. Petitioner asserted this claim in his appeal of right to the Michigan Court of Appeals.   While that court did not expressly address this particular issue, the court obviously denied Petitioner's request for relief.   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

## VI.        Confrontation Clause

Petitioner asserts two claims that his right to confront the witnesses against him was violated.   First, Petitioner argues that permitting Ann Hunt to testify remotely deprived him of a meaningful opportunity to subject her to cross-examination.   Second, Wendy Jamros testified as to the results of laboratory analysis performed by a third party.   Petitioner asserts that the failure to make available for cross-examination the third party that conducted the laboratory analysis in question violated his right to confront the witnesses against him.

### A.    Ann Hunt

As noted above, Ann Hunt testified regarding the results of DNA testing of certain items of evidence.   For reasons which are not clear from the record, Hunt testified remotely via a

video and audio link which Petitioner argues deprived him of the right to cross-examine the witnesses against him.

Petitioner asserted this claim in his appeal of right to the Michigan Court of
Appeals.

The Confrontation Clause of the Sixth Amendment, applied to the states through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 403-05 (1965), guarantees to every criminal defendant the right "to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42 (2004). This right entitles the accused to see the witnesses against him face-to-face, and to hear their testimony. *See Dowdell v. United States*, 221 U.S. 325, 329-30 (1911). While confrontation usually occurs with the witness being physically present in the courtroom with the defendant, the Confrontation Clause does not prohibit a witness from testifying remotely so long as the witness was properly sworn, subject to full cross-examination, and was visible to the defendant and fact-finder. *See United States v. Benson*, 79 Fed. Appx. 813, 820-21 (6th Cir., Oct. 28, 2003). The record reflects that Petitioner's counsel was afforded ample opportunity to cross-examine Hunt. Moreover, Petitioner has neither presented evidence nor identified anything in the record to suggest that the aforementioned requirements applicable to remote testimony were not satisfied.

Petitioner asserted this claim in his appeal of right to the Michigan Court of Appeals. While that court did not expressly address this particular issue, the court obviously denied Petitioner's request for relief. This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.    Wendy Jamros

As previously noted, Jamros performed a sexual assault forensic examination on J.B. Jamros testified as to the results of her examination and the conclusions she reached therefrom. As part of her testimony, Jamros also testified concerning the results of laboratory testing performed on biological material recovered from J.B. This laboratory testing, however, was performed by a different individual who did not testify at Petitioner's trial. Petitioner argues that because he was not permitted to cross-examine the person who performed these laboratory tests, his rights under the Confrontation Clause were violated. As discussed below, however, even if the Court assumes that Petitioner was improperly denied the opportunity to cross-examine the individual in question, this error was harmless.

As the Supreme Court has held, "fidelity to the Confrontation Clause permit[s] admission of 'testimonial statements of witnesses absent from trial. . .only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.'" *Bullcoming v. New Mexico*, 564 U.S. 647, 658 (2011) (citations omitted). Moreover, the Court "refused to create a 'forensic evidence' exception to this rule." *Ibid.* (citation omitted). Thus, to the extent that Jamros testified as to the results of laboratory testing performed by a different individual who neither testified at Petitioner's trial nor was previously subject to cross-examination regarding the evidence in question, Petitioner's rights under the Confrontation Clause were violated.

Confrontation Clause errors, however, are subject to harmless error analysis. *See, e.g., McCarley v. Kelly*, 801 F.3d 652, 665 (6th Cir. 2015) (citations omitted). Pursuant to this analysis, Petitioner is not entitled to relief unless the constitutional error in question caused a

28

"substantial and injurious effect or influence in determining" the verdict. *Ibid.* (citations omitted). This inquiry does not focus on whether there was, absent the improperly admitted evidence, sufficient evidence to support a conviction, but instead the Court must determine whether the error itself substantially influenced the outcome. *Ibid.* (citations omitted). When making this determination, the Court must consider the following factors: (1) the importance of the testimony in question to the prosecution's case; (2) whether the testimony in question was cumulative; (3) the presence or absence of evidence corroborating or contradicting the evidence in question; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *Id.* at 665-66 (citations omitted). Considered in context, and in light of these factors, the Court finds that the error in question was harmless and, therefore, does not merit relief.

Jamros testified that she possesses a Master's Degree in advanced practice nursing which allows her to "function as a physician" so long as there is "a physician available for collaboration." (Trial Transcript, January 15, 2014, at PageID.728-29). Jamros has performed "thousands" of gynecological examinations and received specialized training to perform sexual assault forensic examinations. (Trial Transcript, January 15, 2014, at PageID.729-30). Jamros has performed "approximately 20" sexual assault forensic examinations. (Trial Transcript, January 15, 2014, at PageID.731).

Jamros testified that when she examined J.B. she observed "a lot of vaginal irritation." (Trial Transcript, January 15, 2014, at PageID.734). According to Jamros, this type of vaginal irritation is unexpected in a prepubescent child and was consistent with J.B. having engaged in sexual intercourse. (Trial Transcript, January 15, 2014, at PageID.734, 739).

Jamros testified that she also observed "a white milky vaginal drainage" which was evidence of a vaginal infection.  (Trial Transcript, January 15, 2014, at PageID.734).  Jamros indicated that only laboratory testing could identify the specific type of vaginal infection from which J.B. was suffering.  (Trial Transcript, January 15, 2014, at PageID.734).  On cross-examination, Jamros testified that the specific type of infection was subsequently identified by a different individual who had performed the appropriate laboratory testing.  (Trial Transcript, January 15, 2014, at PageID.743-44).

Again, while Petitioner should arguably have been permitted to cross-examine the person who performed the laboratory testing about which Jamros testified, this error was harmless.  Jamros testified that the vaginal discharge which she observed was, by itself, evidence that J.B. was suffering from a vaginal infection.  As Jamros further testified, the only thing that the laboratory testing determined was the specific type of vaginal infection from which J.B. was suffering.  Moreover, Jamros' testimony that she observed vaginal irritation consistent with sexual intercourse was not based upon or dependent upon any laboratory testing.  In sum, based upon her own observation, training, and experience, Jamros diagnosed J.B. with an unexpected vaginal infection and vaginal irritation consistent with sexual intercourse.  That subsequent laboratory testing subsequently identified the specific type of vaginal infection from which J.B. was suffering cannot reasonably be said to have substantially influenced the trial judge's decision to find Petitioner guilty of sexually assaulting J.B.

Petitioner did not present this particular claim to the Michigan Court of Appeals, but instead asserted it for the first time to the Michigan Supreme Court which denied Petitioner's delayed application for leave to appeal.  Petitioner has, therefore, failed to properly exhaust this

particular claim.  *See, e.g., Olson v. Little*, 604 Fed. Appx. 387, 402-03 (6th Cir., Mar. 9, 2015) (the habeas exhaustion requirement is not satisfied where a petitioner first presents a claim on discretionary appeal to the state's highest court, unless that court opts to review the merits of the claim).  Petitioner's failure to exhaust this claim notwithstanding, it may nonetheless be denied on the merits.  *See* 28 U.S.C. § 2254(b)(2).  As discussed above, this claim does not entitle Petitioner to relief and is, therefore, rejected.

**VII.     Brady Violation**

Petitioner argues that his right to a fair trial was violated by the "prosecution's withholding of evidence."  However, in his petition, Petitioner fails to even identify what evidence he alleges was withheld from the defense.  The Court notes that in one of Plaintiff's supplemental state court pleadings, Plaintiff alleges that the prosecution improperly withheld from the defense a "blue laptop computer" and a "cell phone."  The Court will, therefore, analyze Petitioner's claim as alleging that the prosecution improperly withheld these two items.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith  or bad faith of the prosecution."  *Wilson v. Mitchell*, 498 F.3d 491, 512 (6th Cir. 2007) (quoting *Brady*, 373 U.S. at 87).   The material which must be disclosed under *Brady* "encompasses impeachment evidence as well as exculpatory evidence."  *Wilson*, 498 F.3d at 512 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  To establish a *Brady* violation, Petitioner must establish: (1) the prosecution suppressed or withheld evidence, (2) such evidence

was favorable to the defense, and (3) the suppressed evidence was material. *See United States v. Dado*, 759 F.3d 550, 559-60 (6th Cir. 2014).

The materiality requirement is not a sufficiency of the evidence test. *See In re McDonald*, 514 F.3d 539, 545-46 (6th Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995)). In other words, Petitioner is not required to demonstrate that consideration of the undisclosed evidence results in less than sufficient evidence to support his conviction. This is because "the possibility of an acquittal of a criminal charge does not imply an insufficient evidentiary basis to convict." *In re McDonald*, 514 F.3d at 546 (quoting *Whitley*, 514 U.S. at 434-35). Also, the withheld evidence must be considered "collectively, not item by item." *Whitley*, 514 U.S. at 436-37. The materiality requirement is satisfied where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Whitley*, 514 U.S. at 435). In short, Petitioner must demonstrate a "reasonable probability of a different result." *Dretke*, 540 U.S. at 698 (quoting *Whitley*, 514 U.S. at 434).

Even if the Court assumes that the computer and cell phone at issue were suppressed or withheld by the prosecution, Petitioner makes absolutely no argument, in either his petition or any state court pleading, that this evidence was favorable or material. Petitioner asserted this claim in his appeal of right to the Michigan Court of Appeals. While that court did not expressly address this argument, the court obviously denied Petitioner's request for relief. This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable

determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

**VIII.**          **Ineffective Assistance**

Petitioner asserts that his trial counsel rendered ineffective assistance thereby depriving him of the right to a fair trial.   Specifically, Plaintiff argues this his attorney failed to: (1) subpoena Jennifer Sheppard as a witness; (2) request a continuance; and (3) object to the admission of evidence that Petitioner previously engaged in sex with underage girls.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.   *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).   To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."   *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).   A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."   *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689).   Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."   *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.   Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356,

371 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).   In the context of a sentencing proceeding, Petitioner must demonstrate that there exists a reasonable probability that, but for counsel's errors, he would have received a more favorable sentence.   *See, e.g., Stumpf v. Robinson*, 722 F.3d 739, 753-54 (6th Cir. 2013) (to prevail on a claim that counsel rendered ineffective assistance at sentencing, petitioner must demonstrate that there exists a reasonable probability that absent counsel's errors he would have received a different sentence).

The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."   *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).   This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."   *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."   *Premo*, 562 U.S. at 122.   Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."   Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.   *Id.* (citations omitted).   As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.   Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

A.    Jennifer Sheppard

Petitioner faults his attorney for failing to call Jennifer Sheppard to testify at trial. Petitioner has failed to even describe what testimony Sheppard would have offered and how such would have advanced his defense.    Thus, Petitioner cannot establish that the failure to call Sheppard to testify constituted deficient performance or that such prejudiced his ability to defend himself at trial.    Petitioner did not present this claim in state court below.    Petitioner's failure to exhaust this claim notwithstanding, it may nonetheless be denied on the merits.    *See* 28 U.S.C. § 2254(b)(2).    As discussed herein, this claim is without merit and is, therefore, rejected.

B.    Continuance

As noted above, Ann Hunt testified via a remote audio and video connection. Petitioner claims that throughout her testimony, Hunt referred to her "notes."    Petitioner faults his attorney "for failing to ask the court for continuance by not having access to the notes prosecution key witness DNA expert, Ann Hunt. . ."    Petitioner fails to indicate what he expected his attorney to do or accomplish in the event he was granted a continuance.    Petitioner likewise fails to explain how counsel's failure to obtain a continuance prejudiced his defense.    Petitioner did not present this claim in state court below.    Petitioner's failure to exhaust this claim notwithstanding, it may nonetheless be denied on the merits.    *See* 28 U.S.C. § 2254(b)(2).    As discussed herein, this claim is without merit and is, therefore, rejected.

C.    Prior Sexual Conduct

Petitioner next faults his attorney for failing to object to evidence that Petitioner previously engaged in sex with underage girls.    Petitioner has failed to identify the testimony to

which he believes his attorney should have objected.   The Court assumes that Petitioner is faulting his attorney for failing to object to testimony from Trisha Betlam, April Noha, and Amber Lahaie that they began having sex with Petitioner when they were each less than fifteen (15) years old, as well as Jenny Tasker's testimony that Petitioner sexually assaulted her when she was nine (9) years old.

Petitioner also fails, however, to offer any argument as to how his attorney's failure to object to this evidence constituted deficient performance or prejudiced his defense.   By failing to make any such argument, Petitioner has failed to demonstrate that he is entitled to relief. Petitioner did not present this claim in state court below.   Petitioner's failure to exhaust this claim notwithstanding, it may nonetheless be denied on the merits.   *See* 28 U.S.C. § 2254(b)(2).   As discussed herein, this claim is without merit and is, therefore, rejected.

## IX.        No Probable Cause to Arrest

Petitioner argues that he is entitled to relief on the ground that there did not exist probable cause to arrest him for the crimes presently at issue.   The legality of Petitioner's arrest is irrelevant.   *See Gerstein v. Pugh*, 420 U.S. 103, 118-19 (1975) (recognizing the "established rule" that an illegal arrest does not void a subsequent conviction); *United States v. Crews*, 445 U.S. 463, 474 (1980) ("[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction").   Accordingly, this argument is rejected.

## X.        Cumulative Effect

Lastly, Petitioner asserts that his right to a fair trial was violated by "cumulative error."   As the Sixth Circuit has made clear, however, habeas relief cannot be premised upon an alleged accumulation of errors.   *See Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("post-

AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief"); *see also*, *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (same).    Accordingly, this claim is rejected.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Betlem's petition for writ of habeas corpus be **denied**.    The undersigned further recommends that a certificate of appealability be denied.    *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.    28 U.S.C. § 636(b)(1)(C).    Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: October 31, 2018                      /s/ Ellen S. Carmody w
                                           ELLEN S. CARMODY
                                           United States Magistrate Judge

37